Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL II

| | | |
|---|---|---|
| GABRIEL DÍAZ RODRÍGUEZ, SEBASTIÁN GABRIEL DÍAZ FUENTES, GABRIELA MARIE DÍAZ FUENTES<br><br>Recurridos<br><br>v.<br><br>MUNICIPIO DE NARANJITO, COMPAÑÍA DE SEGUROS ABC, INC., J.M. CARIBBEAN BUILDERS CORP. Y OTROS<br><br>Peticionarios | KLCE202400656 | *CERTIORARI* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso número: BY2018CV00160<br><br>Sobre: Daños |

Panel integrado por su presidente, el juez Bermúdez Torres, el juez Adames Soto y la juez Aldebol Mora.

Aldebol Mora, Juez Ponente

## R E S O L U C I Ó N

En San Juan, Puerto Rico, a 15 de julio de 2024.

Comparece la parte peticionaria, Javier Hiram Morales López, mediante el recurso de epígrafe y nos solicita la revocación de la *Resolución* emitida y notificada por el Tribunal de Primera Instancia, Sala Superior de Bayamón, el 17 de abril de 2024. En el referido dictamen, el foro recurrido declaró No Ha Lugar la solicitud de desestimación promovida por el peticionario.

Por los fundamentos que expondremos a continuación, se deniega la expedición del auto solicitado. Veamos.

**I**

El 3 de mayo de 2018, Gabriel Díaz Rodríguez (Díaz Rodríguez), por sí y en representación de su hijo Sebastián Gabriel Díaz Fuentes y su hija Gabriela Marie Díaz Fuentes, ambos menores de edad (recurridos), incoó una *Demanda* sobre daños y perjuicios

Número Identificador

RES2024 _____

en contra del Municipio Autónomo de Naranjito (Municipio).[1] Alegó que, el 15 de noviembre de 2017, su esposa y madre de los menores, Marielly Fuentes Torres (Fuentes Torres), transitaba en su vehículo por el Barrio Cedro Abajo en Naranjito cuando sufrió un accidente que le produjo la muerte. Particularizó que Fuentes Torres perdió el control del vehículo cuando manejaba por la mencionada vía, lo cual provocó que el automóvil se deslizara por la carretera y cayera por un risco. Detalló que tal accidente provocó que Fuentes Torres saliera expulsada del vehículo, ocasionándole la muerte en el acto, mientras que ambos menores que se encontraban en el automóvil resultaron heridos. Arguyó que, previo al accidente, obreros del Municipio habían limpiado la vía de rodaje municipal luego de deslizamientos de tierra que las obstruyeron, como consecuencia del huracán María. Según adujo, dichas labores se realizaron de forma negligente, al dejar las carreteras en condiciones que no las hacían aptas para transitar, toda vez que las vías estaban llenas de lodo. No obstante, planteó que, previo al accidente, se le había notificado al Municipio que las condiciones de la carretera en cuestión continuaban representando un peligro para las personas que transitaban por esa vía. Sostuvo que las acciones u omisiones negligentes del Municipio, al dejar las vías de rodaje en condiciones inadecuadas para transitar, eran el nexo causal de los daños sufridos por este y sus hijos.

En la acción de epígrafe, Díaz Rodríguez argumentó que, como consecuencia del accidente, la pérdida de su esposa y madre de sus hijos le había ocasionado una depresión severa, así como sufrimientos y angustias mentales en sus hijos que, no solo habían perdido a su madre, sino que presenciaron el momento en el que esta perdió la vida. En virtud de ello, solicitó $250,000.00 por

---

[1] Apéndice del recurso, págs. 1-5.

concepto de los daños emocionales experimentados por él y no menos de $500,000.00 por cada uno de sus hijos, por concepto de angustias y sufrimientos mentales. A su vez, solicitó el lucro cesante, costas, gastos y la suma de $50,000.00 por concepto de honorarios de abogado.

Posteriormente, el 25 de febrero de 2020,[2] el Tribunal de Primera Instancia autorizó una enmienda a la demanda, solicitada por Díaz Rodríguez.[3] Ello, a los fines de incluir como codemandada a las compañías contratadas por el Municipio para realizar los trabajos de recogido de escombros y limpieza de caminos, J.M. Caribbean Builders Corp. y Design Build, LLC, así como a la aseguradora y ajustadora del Municipio, One Alliance Insurance Corporation.[4]

Luego de varios trámites procesales, el 20 de noviembre de 2023, Díaz Rodríguez presentó una segunda solicitud de enmienda a la demanda, a los efectos de incluir a otro codemandado.[5] En síntesis, indicó que, el 1 de agosto de 2023, llevó a cabo la deposición de Javier Hiram Morales López (Morales López o peticionario), en representación de J.M. Caribbean Builders Corporation. Alegó que, a raíz de dicha deposición, advino en conocimiento, por primera vez, de que Morales López realizó labores de remoción de terreno en el área del accidente, así como en el área adyacente a su propiedad. En apoyo a su contención, citó los siguientes extractos de la transcripción de la deposición:

> Lcdo. Alberto Rivera- ¿Cuánto tiempo aproximado usted estuvo trabajando en ese derrumbe?
>
> Javier Morales López - Fueron varias semanas.
>
> Lcdo. Alberto Rivera- Varias semanas. Por la amplitud y magnitud del derrumbe. ¿Verdad que sí?
>
> Javier Morales López - No.

---

[2] Apéndice del recurso, pág. 31.
[3] Íd., págs. 14-16.
[4] Íd., págs. 17-21.
[5] Íd., págs. 609-612.

Lcdo. Alberto Rivera- ¿No? ¿Y por qué entonces estuvo varias semanas?

**Javier Morales López** - Porque se rompió la excavadora al principio, y tuvimos... como eso se hacía entre rato y rato, tal vez los weekends. Me acuerdo que se rompió y estuvo un tiempo rota. **Tuvimos que traer otra máquina y terminar el trabajo con la otra máquina**.

Lcdo. Alberto Rivera- ¿Qué otra máquina fue la que entonces se utilizó?

Javier Morales López - Otra excavadora.

**Lcdo. Alberto Rivera- ¿Perteneciente a JM Caribbean?**

**Javier Morales López - No.**

Lcdo. Alberto Rivera- ¿Perteneciente a quién?

**Javier Morales López - Yo se la alquilé.**

Lcdo. Alberto Rivera- ¿A quién?

**Javier Morales López -A Nelson Cruz.**

Lcdo. Alberto Rivera- Y Nelson Cruz, ¿quién es?

Javier Morales López - Nelson Cruz es un contratista de Naranjito.

**Lcdo. Alberto Rivera- Okay. Y, ¿usted se la alquiló, usted como Javier Morales o como JM Caribbean?**

**Javier Morales López -No, se la alquilé como mi persona.**

Lcdo. Alberto Rivera- Bien. Le pregunto, ¿si usted puede identificarnos, si Nelson Cruz hace negocios como alguna entidad corporativa o hace negocios en su carácter personal?

Javier Morales López - Bueno, Nelson Cruz tiene una corporación y es contratista también, colega contratista.

Lcdo. Alberto Rivera- ¿Sabe cómo se llama la corporación de Nelson?

Javier Morales López -NS Rental.

Lcdo. Alberto Rivera- NS Rental. ¿Usted tiene copia de ese... que nos pueda hacer llegar, de ese alquiler, de ese arrendamiento de esa máquina?

Javier Morales López - No.

**Lcdo. Alberto Rivera- O sea, ¿que esto se hizo de manera verbal?**

**Javier Morales López - Correcto.**

[...]

Lcdo. Rivera Ramos- Bien. Entonces, le pregunto, ¿dónde fue que usted utilizó maquinaria o equipo pesado luego de poder tener acceso para poder limpiar ese derrumbe?

Javier Morales López- En esta área. (Marcado en el mapa)

> **Lcdo. Rivera Ramos**- ¿En esta área? ¿Puede marcármelo, por favor, con el bolígrafo dónde...? Hágame una estrellita. Okay. **Es decir que usted sí utilizó equipo pesado donde usted me acaba de marcar la equis**. Necesito la voz.
>
> **Javier Morales López- Correcto.**
>
> **Lcdo. Rivera Ramos- Gracias. ¿Qué tipo de equipo pesado fue el que utilizó ahí en esa área?**
>
> **Javier Morales López- Excavadora y trucks de tumba.**
>
> **Lcdo. Rivera Ramos- Okay. Le pregunto, ¿para qué fecha usted utilizó una excavadora y trucks de tumba para remover el derrumbe que había en la parte posterior de su casa?**
>
> **Javier Morales López - Fueron fechas posteriores al Huracán María, diría yo entre octubre, más o menos, octubre tal vez principios de noviembre.**[6]

En su solicitud, Díaz Rodríguez argumentó que, de lo precitado, Morales López aceptó haber realizado, en su carácter personal, los movimientos de terrenos en su propiedad, los cuales contribuyeron a causar las condiciones peligrosas que ocasionaron la muerte de Fuentes Torres. Enfatizó que Morales López fue cocausante de los daños al haber utilizado, en su propiedad, el equipo pesado de diversas compañías para hacer un corte en el talud de la montaña donde, posteriormente, ocurrió el accidente debido a las condiciones de peligro dejadas en la carretera cuando Morales López realizó el movimiento de terreno sin los permisos y autorización requeridas por las agencias correspondientes. En vista de ello, solicitó la autorización del tribunal para enmendar, por segunda vez, la demanda de epígrafe, a los fines de incluir a Morales López, en su carácter personal, como parte codemandada y a su compañía aseguradora, Triple S Propiedad.[7]

Atendida la solicitud, el 21 de noviembre de 2023, notificada el 28 del mismo mes y año, el foro primario autorizó enmendar la demanda de epígrafe mediante *Orden*.[8]

---

[6] Apéndice del recurso, págs. 610-611. (Énfasis original omitido). (Énfasis nuestro).
[7] Íd., págs. 613-618, 625-630.
[8] Entrada Núm. 136 del Caso Núm. BY2018CV00160 en el Sistema Unificado de Manejo y Administración de Casos (SUMAC).

Así las cosas, el 1 de marzo de 2024, Morales López instó una moción de desestimación.[9] En esencia, señaló que en la demanda original no existía reserva de derecho sobre codemandados desconocidos o de nombres desconocidos, a excepción de la reserva para la aseguradora del Municipio. Adujo que, por ello, Díaz Rodríguez renunció a cualquier causa de acción contra terceros, toda vez que era improcedente la acumulación de nuevas partes fuera del término prescriptivo original. Por otro lado, alegó que, si Díaz Rodríguez hubiese hecho la reserva para sustituir codemandados desconocidos o de nombres desconocidos, tampoco procedía la enmienda a la demanda, ya que los requisitos establecidos por la teoría cognoscitiva del daño se cumplieron previos al 1 de agosto de 2023, fecha con la cual Díaz Rodríguez intentaba justificar su enmienda. Planteó que Díaz Rodríguez había declarado en una deposición que recibió información de un vecino, Walberto Rolón Fuentes (Rolón Fuentes), quien le dijo que Morales López había limpiado el derrumbe de su casa y que dicho vecino le dijo a Morales López que tenía que limpiar el camino. En específico, citó los siguientes extractos de la deposición de Díaz Rodríguez:

> P. Le pregunto si el camino para llegar a la casa de los papás de su esposa[,] luego del huracán María[,] [¿]quedó bloqueado por escombros,...
>
> R. Sí.
>
> P. ...deslizamientos de terrenos...
>
> R. Unjú. Sí.
>
> P. ...también[?]
>
> R[.] Sí[.]
>
> P. Okay. ¿Quién, si usted lo sabe, quién limpió...? O sea, ¿se llegó a bloquear la calle completamente?
>
> R. Sí.
>
> **P.** Okay. ¿Recuerdas quién, obviamente[,] despejó la calle, el camino? Específicamente[.] [C]uando me refiero ahora a la calle o camino me estoy refiriendo específicamente al lugar

---

[9] Apéndice del recurso, págs. 661-680.

donde ocurre el accidente. **[¿]Quién despejó ese camino allí, esa área?**

**R.** Bueno, yo tengo entendido[,] porque **yo no estaba cuando ellos estaban haciendo la limpieza**...

P. Gracias por la aclaración. Ajá.

**R.** O sea, ellos... **Tengo entendido que estaba el vecino que es JM, Javier Morales <u>con unos empleados</u>[,] porque él es vecino**. Donde ocurrió él tiene una casa allí y entonces, él estaba limpiando el derrumbe de su casa más...también. Y entonces, también tengo entendido que después que él terminó...**lo que tengo entendido porque eso me estuvo hablando Walberto Rolón, cuando él iba a trabajar les dijo:** "Mira, **<u>tienen</u> que lavar ese camino que eso lo <u>dejaron</u> ahí una cosa... o sea, que puede haber un accidente**".

P. Okay.

R. Después que **<u>ellos terminan</u>**[,] creo que **vino Design Build**, algo así, esa compañía **a terminar**, a terminar y **parece que llovió** durante...durante la parte **y pasó lo que pasó**. Osea... *[sic]*

P. Okay. Pero vamos a ir, vamos a ir un poquito más suave por ahí.

R. Ajá.

P. Porque lo que me está diciendo usted es que **es la información que le llega a usted**.

R. S[í][.] [E]s la cosa.

[...]

R. Porque **JM tiene una casa donde ocurrió el accidente**. Él vivía allí y[,] entonces, a él se le fue un derrumbe... **detrás de la casa de él se le fue un derrumbe y pegó a limpiar y entonces, aprovechó y limpi... o sea, y <u>limpiaron</u>**.

P. Okay.

R. O sea...

P. Okay. Okay. Muy bien. ¿Qué más le dijo Walberto a usted, aparte de lo que usted me ha dicho a mí?

R. Bueno, él me dice que cuando él bajaba a trabajar ese día...

P. Cuando me dice: "Ese día", ¿estamos hablando del 15 de noviembre?

R. De noviembre.

C. *[sic]* Correcto.

[...]

P. Okay. O sea, pero lo conoce... ¿Cómo lo conoce? ¿Qué conocimiento tiene usted de él?

R. Lo conozco porque es de Naranjito y Naranjito es pequeño y todo el mundo se conoce.

P. Okay. Okay. ¿No es que compartía con él, ni nada de eso?

R. En ese momento, ese día que pasó el accidente[,] me acuerdo que Walberto reclamó... o sea, le...

P. Sí. No, pero usted, usted. Antes de pasar a Walberto. ¿Usted, usted tenía alguna relación de compartir con JM?

R. No. Lo saludaba. "Hola, ¿cómo estás?". O sea, no soy de... O sea,...

P. Okay. Está bien. No hay problema. Está bien. Perfecto. Lo conoce de vista[,] por así decirlo.

R. No, y es como digo yo, si tengo que tomarme una cerveza con él, pues me la tomo. ¿Entiende? O sea, eso... o sea, antes de que pasara todo.

[...]

**P.** Okay. Pero estamos hablando... eso es... O sea, **¿todavía en noviembre 15 de 2017 estaban limpiando parte del derrumbe?**

**R. <u>Estaban limpiando</u> ese día el derrumbe para que los carros pasaran.**

P. ¿Cuál derrumbe? ¿Cuál derrumbe?

R. El derrumbe del talud, del talud ese que le estoy diciendo donde ocurrió el accidente.

P. Pero[,] por eso. Okay. Hay dos talud. Está el talud que si usted va subiendo la carretera queda a mano izquierda.

R. El de la izquierda.

**P. Okay. ¿Están limpiando ese talud, es lo que usted está diciendo?**

**R. Y la casa de JM**.

P. Y la casa de JM también.

R. Ahí por la parte de atrás ella tiene una entrada en la misma curva.

P. Ajá.

R. En la misma entrada de esa casa atrás así parece se fue un derrumbe de la casa de estaba limpiando. *[sic]*

P. Okay.

**R. <u>Estaban</u> limpiando eso ahí...**

P. Okay. Está bien. Y...

**R. [.]..y limpiando el derrumbe.**

P. Y le pregunto, entonces, [¿]usted dice que lo que le dijo a Walberto es que JM estaba limpiando el derrumbe de su casa[?]

R. Y el otro.

P. ¿Y el otro también?

R. Unjú.

P. ¿El que estaba... el que queda a mano izquierda?

R. El de la izquierda.

[...]

**P.** De esa fotografía, usted me dice que el día del accidente, ¿del talud que se ve a mano izquierda de esta fotografía del Exhibit 2, de ese talud, **JM estaba limpiando lo que estaba cayendo de ese talud**?

**R. No lo que estaba cayendo. Estaba limpiando lo que había aquí. Y prácticamente es la entrada que él tiene para la casa aquí.**

P[.] Okay.

R. Aquí hay una entrada y a él este derrumbe[,] cuando cayó[,] también le cayó a él aquí detrás en esta entrada...

P. Okay.

**R. ...y él estaba limpiando por la parte de esta entrada. O sea, limpiando y limpió, o sea, aprovechó y limpió.**

P. Okay.

R. Esta, si no me equivoco, esta es la entrada que él tiene... Cuando tú subes hay una entrada que él tiene para atrás de la casa de él.

P. Okay. Por eso. Pero cuando usted dice que él estaba limpiando, que JM... y esto obviamente es por...

R. Unjú. Lo que me dijo Walberto.

P. Esto es lo que le menciona Walberto.

R. Correcto. Walberto Rolón.

**P.** Pero... O sea, por eso. Walberto le dijo, usted me dijo ahorita que **Walberto le dijo que él estaba limpiando no solamente un derrumbe que había tenido dentro de su casa, sino también un derrumbe de aquí del talud, de este talud.**

**R. De este talud.**

[...]

**R. Walberto me indicó de que JM estaba limpiando la entrada de su casa, porque él vive aquí.** O sea,...

[...]

**R. Walberto** se vino del trabajo. Lo llamaron y se vino del trabajo y entonces, ahí **cogió a Javier Morales y le dijo:** "Canto de", ya tú sabes. Habló malo. Y yo dije: "¿Qué pasó?". **"Mira, por culpa tuya pasó esto. Se te dijo que lavaras la carretera. Se te dijo que limpiaran, que pegaran**

**manguera"**. O sea, eso...eso... o sea, **eso no me lo dijo Walberto. Eso yo lo vi cuando estaba sucediendo**...

P. Okay.

R. ...en el momento del accidente.

[...]

P. No, Walberto me dice el día que ocurrió el accidente, cuando él llegó[,] que me dice... **le dice a Javier**: "Mira esto", le habló malo. Entonces, **Walberto le dice: "Si yo te lo dije temprano. Se lo dije a <u>tus empleados</u> que <u>lavaran</u> esto, que <u>limpiaran</u> esto"**.

P. Okay.

R. Eso me... Cuando Walberto se lo está diciendo a Javier, pues yo estoy presente. [10]

Asimismo, Morales López incluyó en su solicitud desestimatoria extractos de la deposición que se le hiciera al vecino Rolón Fuentes. En particular, citó lo siguiente:

P. Okay. Pero tú... ese día tú no hablaste con... ¿cómo es que se llama, Javier Morales, Morales?

**R.** La segunda vez que él estaba en... aquí en la esquina de la curva cuando yo bajaba. **Estaban dos muchachos trabajando a mi mano derecha <u>en la entrada de la casa de él</u>, uno <u>con un "digger"</u> y otro mirando, y él estaba acá**.

P. Okay.

**R.** Y yo le dije a él, le dije: "Si llueve, esto se pone malo", y **él me dijo: "Lo <u>vamos</u> a limpiar"**, y yo le...

P. ¿Estamos hablando de ese mismo día?

**R. El día del accidente.**

P. ¿El mismo día?

R. Sí. Es correcto.

[...]

**P. Y él te dijo: "No, eso <u>lo vamos</u> a limpiar"**, te dijo él, entonces.

**R. "Sí, <u>se va</u> a limpiar".**

P. Okay. Está bien. Luego de eso, ¿tú vuelves a hablar con Javier en algún momento?

**R.** No. Cuando llego de... de... por la tarde, por la noche[,] **cuando pasa el accidente** que yo subo[,] que por eso es que yo me expreso que digo... que dije la mala palabra y rastra[ll]é la botella, pero que **después yo dije: "Mira, no tiene culpa, tú sabes"**. [11]

---

[10] Apéndice del recurso, págs. 668-671. (Énfasis original omitido). (Énfasis nuestro).
[11] Íd., pág. 672.

Morales López alegó en su moción de desestimación que, conforme a la evidencia anejada, antes citada, quedaba demostrado que Díaz Rodríguez conocía no solo la identidad de este, sino de la alegada participación en los hechos, desde el mismo día en que estos ocurrieron. En vista de ello, sostuvo que procedía la desestimación de la demanda en lo que a él respectaba.

En respuesta, el 16 de abril de 2024, Díaz Rodríguez se opuso.[12] Aclaró que siempre había alegado que observó a Morales López en el lugar del accidente el mismo día en que ocurrieron los hechos, así como días previos, mientras hacia un corte en el talud donde ocurrió el accidente con equipo y maquinaria que le pertenecía a su corporación, J.M. Caribbean Builders Corp. Sin embargo, arguyó que, hasta el día en que se realizó la deposición el 1 de agosto de 2023, estuvo bajo la creencia de que la presencia en el lugar del accidente y las actuaciones de Morales López eran realizadas en representación de la mencionada corporación, en virtud del contrato suscrito con el Municipio. Adujo que fue a partir de la admisión y aceptación de Morales López de que estuvo realizando movimientos de tierra en su carácter personal, dentro de su propiedad personal y privativa, al igual que en el lugar del accidente, haciendo trabajos de recogido de escombros y corte de talud, que entonces advino en conocimiento de esa información. Particularizó que, en la deposición tomada a Morales López el 1 de agosto de 2023, se estableció que llevó el equipo pesado de J.M. Caribbean Builders Corp. y de otra compañía privada, hasta su propiedad personal, para hacer unos movimientos de tierra y recoger un derrumbe en su residencia.

Por otro lado, Díaz Rodríguez precisó que, cuando mencionaba a Morales López como demandado en la deposición y

---

[12] Apéndice del recurso, págs. 927-938.

utilizaba las siglas JM o JM Buildings, se refería a la corporación J.M. Caribbean Builders Corp. Además, alegó que, en la solicitud de desestimación, Morales López omitió citar lo siguiente:

> P[.] - Ocurre el huracán María, la calle queda bloqueada con escombros,...
>
> R[.] - Unjú.
>
> P. - ...deslizamientos y todas las cosas que ocurren allí, ¿verdad?
>
> R. - Sí.
>
> P. Alguien[,] obviamente[,] tuvo que haber limpiado eso para que los carros pudieran discurrir por ese camino. ¿Verdad que sí?
>
> R. - Unjú.
>
> P. Por eso. "Unjú"...
>
> R. Sí, sí, sí.
>
> **P. - Okay. Entonces, ¿sabe usted quién hizo ese primer movimiento de sacar los escombros del camino, los deslizamientos del camino para que pudieran pasar los carros?**
>
> **R. - Bueno, yo sé lo que me dijo Walberto Rolón en ese momento.**
>
> P. Okay.
>
> **R. Que fue JM Buildings**.[13]

Asimismo, Díaz Rodríguez planteó que Morales López también omitió de los extractos citados de su deposición la información que tenía a su alcance hasta aquel momento sobre los nombres y trabajos de remoción de escombros, recogido de tierra y derrumbes que realizaron las compañías privadas contratadas por el Municipio. Sobre ese particular, añadió el siguiente fragmento de su deposición:

> **P** - Entiendo que lo que usted ha declarado es que[,] el mismo día que ocurrió el accidente, el 15 de noviembre de 2017, **Walberto le dijo** allí mismo que él vio que **estaban limpiando** ese día, **removiendo** el deslizamiento de terreno que había ocurrido. Que allí **estuvo JM** y que **después que JM terminó llegó Design Build**.
>
> [...]
>
> **R. Eso de Design Build me lo indicó Nano.**
>
> P. Okay.

---

[13] Apéndice del recurso, pág. 936. (Énfasis original omitido). (Énfasis nuestro).

R. Nano.

**P[.] - ¿Y cuándo Nano le dijo eso a usted?**

**R. - El mismo día del accidente.**

P. - ¿Y dónde estaba Nano cuando le dijo eso a usted?

**R.** - Donde estaba mi esposa muerta[,] allí. O sea, estábamos allí. Entonces, Nano... empezó Design... Permiso. **Empezó JM y terminó Design**.[14]

Por lo antes expuesto, Díaz Rodríguez sostuvo que no procedía la solicitud de desestimación promovida por Morales López, puesto que la demanda no estaba prescrita cuando este último fue incluido, en su carácter personal, como codemandado en el caso de epígrafe. En la alternativa, propuso la celebración de una vista evidenciaria o un juicio plenario para que el foro juzgador recibiera la prueba en aras de resolver y adjudicar la controversia sobre prescripción.

Evaluadas las posturas de las partes, el 17 de abril de 2024, el Tribunal de Primera Instancia emitió la *Resolución* que nos ocupa.[15] Mediante dicho dictamen, el foro primario declaró No Ha Lugar la solicitud de desestimación presentada por Morales López.

En desacuerdo, el 2 de mayo de 2024, Morales López presentó una *Moción de Reconsideración*.[16] Por su parte, Díaz Rodríguez, en lugar de oponerse, sometió una *Moción en Solicitud de Vista de Conferencia con Antelación al Juicio y/o Vista Transaccional*.[17] Atendida la solicitud de Morales López, el 14 de mayo de 2024, el foro *a quo* declaró No Ha Lugar el referido petitorio de reconsideración.[18]

Inconforme, el 13 de junio de 2024, la parte peticionaria acudió ante nos mediante el recurso de epígrafe y realizó el siguiente señalamiento de error:

> Erró crasamente el Tribunal de Primera Instancia al negarse a desestimar la Segunda Demanda Enmendada presentada contra el peticionario, señor Morales López,

---

[14] Apéndice del recurso, pág. 936. (Énfasis original omitido). (Énfasis nuestro).
[15] Íd., pág. 1062.
[16] Íd., págs. 1063-1081.
[17] Íd., págs. 1084-1086.
[18] Íd., pág. 1087.

por estar prescrita, a pesar de haber tenido ante sí evidencia de la falta de diligencia de los demandantes-recurridos y declaraciones juramentadas que confirman que estos conocieron la identidad y alegada participación del compareciente desde el mismo día de los hechos, por lo cual es inaplicable la teoría cognoscitiva del daño en este caso.

Evaluado lo anterior, ordenamos a la parte recurrida mostrar causa por la cual no debamos expedir el auto de *certiorari* y revocar el dictamen impugnado. Ha transcurrido mayor término a lo concedido sin que la parte recurrida haya acreditado escrito alguno ante esta Curia. Por tanto, según advertido, procedemos a resolver sin el beneficio de su comparecencia.

## II

El *certiorari* es un recurso extraordinario mediante el cual un tribunal de jerarquía superior puede revisar discrecionalmente una decisión de un tribunal inferior. *Rivera et al. v. Arcos Dorados et al.*, 212 DPR 194 (2023); *Torres González v. Zaragoza Meléndez*, 211 DPR 821 (2023); *Caribbean Orthopedics v. Medshape et al.*, 207 DPR 994, 1004 (2021). Ahora bien, tal discreción no opera en lo abstracto. Con respecto a lo anterior y para revisar los dictámenes interlocutorios del Tribunal de Primera Instancia, la Regla 52.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 52.1, dispone, en su parte pertinente, lo siguiente:

> El recurso de *certiorari* para revisar resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia, solamente será expedido por el Tribunal de Apelaciones cuando se recurra de una resolución u orden bajo las Reglas 56 y 57 de este apéndice o de la denegatoria de una moción de carácter dispositivo. No obstante, y por excepción a lo dispuesto anteriormente, el Tribunal de Apelaciones podrá revisar órdenes o resoluciones interlocutorias dictadas por el Tribunal de Primera Instancia cuando se recurra de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciarios, anotaciones de rebeldía, en casos de relaciones de familia, en casos que revistan interés público o en cualquier otra situación en la cual esperar a la apelación constituiría un fracaso irremediable de la justicia. Al denegar la expedición de un recurso de *certiorari* en estos casos, el Tribunal de Apelaciones no tiene que fundamentar su decisión.

[. . .]

Según se desprende de la citada Regla, este foro apelativo intermedio podrá revisar órdenes interlocutorias discrecionalmente, cuando se recurre de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciarios, anotaciones de rebeldía o en casos de relaciones de familia o que revistan interés público, o en aquellas circunstancias en las que revisar el dictamen evitaría un irremediable fracaso de la justicia, entre otras contadas excepciones.

A esos efectos, la Regla 40 del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 40, dispone los criterios a considerar para ejercer sabia y prudentemente su decisión de atender o no las controversias ante sí. *Torres Martínez v. Torres Ghigliotty*, 175 DPR 83, 96-97 (2008). Véase, además, *BPPR v. SLG Gómez-López*, 2023 TSPR 145, 213 DPR ___ (2023); *Rivera et al. v. Arcos Dorados et al.*, supra; *Pueblo v. Rivera Montalvo*, 205 DPR 352, 372 (2020). Así, la Regla 40 del Reglamento del Tribunal de Apelaciones, *supra*, funge como complemento a la Regla 52.1 de Procedimiento Civil, *supra*. *Torres González v. Zaragoza Meléndez*, supra. La precitada Regla dispone lo siguiente:

> El [T]ribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari* o de una orden de mostrar causa:
>
> (A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
>
> (B) Si la situación de hechos planteada es la más indicada para el análisis del problema.
>
> (C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto en la apreciación de la prueba por el Tribunal de Primera Instancia.
>
> (D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, los cuales deberán ser elevados, o de alegatos más elaborados.

(E) Si la etapa de los procedimientos en que se presenta el caso es la más propicia para su consideración.

(F) Si la expedición del auto o de la orden de mostrar causa no causa un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

(G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia. 4 LPRA Ap. XXII-B, R. 40.

Sin embargo, ninguno de los mencionados criterios es determinante, por sí solo, para este ejercicio y no constituye una lista exhaustiva. *García v. Padró*, 165 DPR 324, 335 esc. 15 (2005). Por lo que, de los factores esbozados "se deduce que el foro apelativo intermedio evaluará tanto la corrección de la decisión recurrida, así como la etapa del procedimiento en que es presentada; esto, para determinar si es la más apropiada para intervenir y no ocasionar un fraccionamiento indebido o una dilación injustificada del litigio". *Torres Martínez v. Torres Ghigliotty*, supra, pág. 97. (Énfasis omitido).

Nuestro Tribunal Supremo ha expresado también que, de ordinario, el tribunal revisor "no intervendrá con el ejercicio de la discreción de los tribunales de instancia, salvo que se demuestre que hubo un craso abuso de discreción, o que el tribunal actuó con prejuicio o parcialidad, o que se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo, y que nuestra intervención en esa etapa evitará un perjuicio sustancial". *Zorniak Air Servs. v. Cessna Aircraft Co.*, 132 DPR 170, 181 (1992), citando a *Lluch v. España Service Sta.*, 117 DPR 729, 745 (1986). Véase, además, *Rivera y otros v. Bco. Popular*, 152 DPR 140, 155 (2000).

Esbozada la norma jurídica, procedemos a aplicarla al recurso ante nos.

**III**

La parte peticionaria plantea como su único señalamiento de error que el Tribunal de Primera Instancia incidió al no desestimar la causa de acción de epígrafe por prescripción. En síntesis, sostiene que el foro *a quo* tenía ante sí evidencia sobre la falta de diligencia desplegada por la parte recurrida al no incoar oportunamente su reclamo ante el foro judicial. Arguye que hay declaraciones juradas que confirman que los recurridos conocían la identidad y presunta participación de este desde el día de los hechos, por lo que era inaplicable la teoría cognoscitiva del daño en el presente caso.

Luego de un examen sosegado del expediente ante nos, colegimos que no existe criterio jurídico que amerite nuestra intervención con lo resuelto por el Tribunal de Primera Instancia. Al entender sobre los planteamientos que la parte peticionaria propone ante este Foro, concluimos que la sala de origen no incurrió en error de derecho ni en abuso de discreción al declarar No Ha Lugar la solicitud de desestimación promovida por la parte peticionaria, ello a fin de que podamos soslayar la norma de abstención judicial que, en dictámenes como el de autos, regula el ejercicio de nuestras funciones.

Al evaluar los documentos que obran en autos, concluimos que nuestra intervención, en esta etapa de los procedimientos, no resulta oportuna. Siendo así, y en ausencia de prueba que nos permita resolver en contrario, denegamos expedir el auto de *certiorari* que nos ocupa, al amparo de lo dispuesto en la Regla 52.1 de Procedimiento Civil, *supra*, y la Regla 40 de nuestro Reglamento, *supra*.

**IV**

Por los fundamentos que anteceden, denegamos la expedición del recurso de *certiorari* solicitado.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones